**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SAUL II SUBSIDIARY LIMITED PARTNERSHIP, Plaintiff, | ) | COFC No. 02-98 C (Judge Allegra) |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to Court of Federal Claims Rule 16 and Appendix A § 14, Plaintiff Saul II Subsidiary Limited Partnership ("Plaintiff" or "Saul II"), by and through undersigned counsel, submits this Memorandum of Contentions of Fact and Law. Set forth below are: (1) facts that Plaintiff expects to prove at trial, as well as a discussion of Plaintiff's position with respect to the facts upon which Defendant the United States ("Defendant") is expected to rely; (2) a statement of the issues of fact and law to be resolved by the Court; and (3) a discussion of the legal principles Plaintiff contends are applicable, as well as Plaintiff's response to Defendant's anticipated legal position.

## I. FACTS EXPECTED TO BE PROVEN

Plaintiff expects to prove the following facts at trial:

On May 28, 1986, Westminster Investing Corporation ("Westminster") and the General Services Administration ("GSA") executed Lease No. GS-11B-60012 ("Lease No. 60012") for space at 601 Pennsylvania Avenue, N.W. in Washington, D.C. Lease No. 60012 provided for "102,609 net usable square feet of modern office and related space at 601 Pennsylvania Avenue,

NW., Washington, D.C. 20004. This space is located in the building as follows: a portion approximately 23,834 square feet being on the 5th floor as shown on the attached floor plan and floors 2, 3, 4th [sic] in their entirety." Lease No. 60012 at 1. Lease No. 60012 required GSA to pay annual rent totaling $2,926,560 at a monthly rate of $243,880. The term of Lease No. 60012 was five (5) years.

Lease No. 60012 contained a section entitled "Tax Adjustment" addressing the payment of real estate taxes under the lease. The section contained additions and deletions to the standard language of the lease. The section stated: "GSA shall pay additional rent for its share of increases in real estate taxes over $583000. Payment shall be in a lump sum and shall become due on the first workday of the month following the month in which paid tax receipts for the current year are presented, or the anniversary date of the lease, whichever is later." Lease No. 60012 § 20. The "Tax Adjustment" section further stated:

> GSA's share of the tax increase shall be based on the ratio of the square feet occupied by the government agency to the total rentable square feet in the building. If GSA's lease terminates before the end of a calendar year, payment will be based on the percentage of the year in which the government agency occupied space. The payment shall not include penalties for non payment or delay in payment. If there is any variance between the assessed value of the government's space and other space in the building, GSA may adjust the basis for determining its share of the tax increase.

Lease No. 60012 § 20. Following the first sentence of the paragraph, the parties inserted the following sentence: "The percentage of occupancy for GSA's share of tax increase is agreed to be 47.77%." *Id*.

Prior to award, the "Tax Adjustment" section further stated: "In the event of any decreases in real estate taxes occurring during the term of occupancy under the lease, the rental amount will be reduced accordingly. The amount of any such reductions will be determined in

the same manner as increases in rent provided under this clause." Lease No. 60012 § 20. Pursuant to its standard policy and practice, Westminster did not accept tax adjustment provisions that provided for a decrease in the rental amount of the lease when negotiating the terms and conditions of a lease. Westminster would require that tax adjustment provisions, such as the tax decrease language in Section 20, be deleted or amended so as to ensure that any rent decreases to the Government did not lower the Government's rental payment below the initial base rent payment provided for in the lease. To reflect this policy, the parties inserted the following sentence following the first sentence of the tax decrease provision: "Provided: such decreases will not lower the rental below the base rental established in Rider No. 1." Lease No. 60012 § 20. Representatives of Westminster and GSA initialed the bottom of the page containing the additional language.

On August 13, 1987, Westminster and GSA executed Lease No. GS-11B-70126 ("Lease No. 70162") for space at 601 Pennsylvania Avenue, N.W. Lease No. 70162 provided for "15,700 net usable square feet of office and related space being a portion of the six floor (plans attached) in the building located at 601 Pennsylvania Avenue, NW., Washington, D.C. 20004." Lease No. 70162 at 1. Lease No. 70162 required GSA to pay annual rent totaling $522,810 at a monthly rate of $43,567.50. The term of Lease No. 70162 was five (5) years.

As with Lease No. 60012, prior to award Lease No. 70162 contained a section entitled "Tax Adjustment." Subsection (D) of the clause contained the following language: "In the event of any decrease in real estate taxes occurring during the term of occupancy under the lease, the rental amount will be reduced accordingly. The amount of any such reductions will be determined in the same manner as increases in rent provided under this clause." Lease No. 70162 § 21(D). Pursuant to Westminster's standard policy and practice not to accept tax

adjustment provisions that provided for a decrease in the rental amount of the lease, the parties added similar language to the tax decrease provision as that added to Lease No. 60012. Following the first sentence of the subsection, the parties inserted the following sentence: "Provided such decrease will not lower the rental below the initial base established in para. 3 of Standard Form 2." Lease No. 70162 § 21(D). Representatives of Westminster and GSA initialed the bottom of the page containing the additional language.

On February 4, 1991, GSA issued Solicitation for Offers ("SFO") No. 91-087, a competitive procurement for the lease of approximately 95,000 square feet of office and related space over a ten-year period. GSA sought to lease space located in Washington, D.C. within the area bounded by Third Street, N.W. on the east, F Street, N.W. on the north, Tenth Street, N.W. on the west and Constitution and Pennsylvania Avenues, N.W. on the south. A transmittal letter accompanying the SFO, dated May 31, 1991, stated that the SFO would serve as the basis of negotiations and would become part of any subsequent lease.

The SFO incorporated standard lease terms employed by GSA. Among the terms in the SFO was Section 3.4, entitled "Tax Adjustment." Paragraph (A) of Section 3.4 provided:

> The Government shall pay additional rent for its share of increases in real estate taxes over taxes paid for the calendar year in which its lease commences (base year). Payment will be in a lump sum and become due on the first workday of the month following the month in which paid tax receipts for the base year and the current year are presented, or the anniversary date of the lease, whichever is later. The Government will be responsible for payment only if the receipts are submitted within 60 calendar days of the date the tax payment is due. If no full tax assessment is made during the calendar year in which the Government lease commences, the base year will be the first year of a full assessment.

SFO at 7. Paragraph (D) of Section 3.4 stated: "In the event of any decreases in real estate taxes occurring during the term of occupancy under the lease, the rental amount will be reduced

accordingly. The amount of any such reduction will be determined in the same manner as increases in rent provided under this clause." SFO at 7.

Westminster submitted a proposal in response to the SFO on June 27, 1991. Westminster's proposal provided for the lease of 95,000 square feet of office space located at 601 Pennsylvania Avenue, N.W. in Washington, D.C. As part of its proposal, Westminster included Standard Form 1217 entitled "Lessor's Annual Cost Statement," which identified Westminster's estimated annual costs of service and utilities to be provided as part of the rental consideration as well as its estimated annual costs of ownership exclusive of capital charges. Included among the estimated annual costs of ownership was real estate taxes for the property, which Westminster listed as $1,500,000.00.

Following submission of its proposal, Westminster and GSA conducted discussions regarding terms of a lease. During negotiations, the parties agreed that numerous terms and conditions included in the SFO should not be applicable to a lease between the parties. The parties made typed and handwritten notations to the lease document, which deleted or altered many of the terms and conditions. *See* Standard Form 2 ¶¶ 4-5; SFO §§ 1.4-1.10, 2.1-2.3, 3.8, 3.12-3.15, 9.1. Although it was the intent of the parties during their discussions regarding SFO 91-087 to amend the tax abatement paragraph, and although other lease provisions were amended, the parties neglected to amend Paragraph (D) of Section 3.4 of the SFO in the final integration of the lease.

GSA selected Westminster's proposal, and GSA and Westminster entered into Lease No. GS-11B-20688 ("Lease No. 20688") on February 24, 1992. Lease No. 20688 provided for base annual rental payments of $3,572,000.00 for a term of ten years, commencing on May 1, 1992 and ending on February 28, 2002. The parties amended the lease by inserting the Government's

occupancy percentage of 46.40% as an addendum to Paragraph (A) of Section 3.4. At no time during the negotiation on the lease did GSA inform Westminster of its intention to take a subsequent tax adjustment or reserve its right to take a tax adjustment to reduce its rental payment.

Effective August 26, 1993, Westminster and Saul II executed novation agreements by which Saul II assumed the rights and responsibilities of the lessor under six separate leases with GSA, including Lease No. 26088. Under the novation agreement, Saul II, designated as the "Transferee" under the agreement, "bec[a]me[] entitled to all rights, titles, and interests of the Transferor [Westminster] in and to the Leases, as if the Transferee were the original party to the Leases." Novation Agreement § (b)(4). In 1995, the parties executed a lease amendment that increased the Government's occupancy percentage from 46.40% to 47.71%.

In 1994, Saul II successfully appealed the real estate tax assessment for 601 Pennsylvania Avenue, N.W. for the tax years ending June 30, 1992 and June 30, 1993. Pursuant to the revised tax assessment, Saul II's annual tax liability for the property dropped from $1,455,700.00 to $1,297,096.00 for the tax year ending June 30, 1992, and from $1,366,432.00 to $1,253,536.00 for the tax year ending June 30, 1993. Saul II also successfully appealed the real estate tax assessments for the property for the 1994, 1995 and 1996 tax years. GSA did not seek any decrease in the rental amount under Lease No. 20688 at the time of the successful appeal of the real estate tax assessment.

Beginning in 1994, GSA and Saul II entered into Supplemental Lease Amendments ("SLAs") to Lease No. 20688 to provide for annual rent adjustments for operating cost escalations. The SLAs specified the amount of the rental increase, the total rental amount and the effective date of the SLA. The SLAs also did not specifically reserve the right of the parties

to seek or require any further rent adjustments for the specific year. The parties executed the following SLAs from 1994 to 1999:

| SLA NUMBER | EFFECTIVE DATE | TOTAL RENT ADJUSTMENT | "NEW ANNUAL RENT" |
|---|---|---|---|
| SLA No. 2 | 5/01/93 | $16,014.16 | $3,588,014.16 |
| SLA No. 3 | 5/01/94 | $11,545.10 | $3,599,599.26 |
| SLA No. 6 | 5/01/95 | $17,131.43 | $3,748,547.89 |
| SLA No. 7 | 5/01/96 | $18,236.81 | $3,766,784.70 |
| SLA No. 9 | 5/01/97 | $13,898.10 | $3,784,705.14 |
| SLA No. 10 | 5/01/98 | $7,335.10 | $3,792,040.24 |
| SLA No. 13 | 5/01/99 | $13,898.10 | $3,805,938.34 |

For each of these SLAs which provided for rental adjustments, the parties specifically memorialized the "new annual rent" under the lease without reducing the rent for adjustments to the real estate taxes. At no time prior to the execution of these amendments did the Government notify Saul II of its intention to seek a further reduction in its rental payment.

On March 25, 1999, GSA unilaterally issued SLA No. 12 to Lease No. 20688 "to provide for taking by the Government of credits due because of reduction of real estate taxes below those applicable for the base year (1992)." SLA No. 12 also provided a reimbursement to Saul II for "a proportionate share of legal expenses incurred in successfully appealing tax assessments." The Government calculated the following credits that it alleged it was owed:

| PERIOD | TAXES PAID | BASE | DIFFERENCE FROM BASE | OCCUPANCY PERCENTAGE | CREDIT |
|---|---|---|---|---|---|
| 1st & 2nd Qtrs. 1992 | $648,547.50 | $727,850.25 | $79,302.75 | 46.40% | |
| 3rd & 4th Qtrs. 1992 | $626,768.00 | $683,216.25 | $56,448.25 | 46.40% | |

| | | | | | |
|---|---|---|---|---|---|
| **FY 1992** | **$1,275,315.50** | **$1,411,066.50** | **$135,751.00** | **46.40%** | **$62,988.46** |
| 1st & 2nd Qtrs. 1993 | $626,768.00 | | | 46.40% | |
| 3rd Qtr. 1993 | $577,108.16 | | | 46.40% | |
| 4th Qtr. 1993 | $288,554.08 | | | 46.40% | |
| **FY 1993** | **$1,492,430.24** | **$1,275,315.50** | **-$217,144.74** | **46.40%** | **-$100,741.24** |
| 1st, 2nd & 3rd Qtrs. 1994 | $865,662.24 | | | 46.40% | |
| 4th Qtr. 1994 | $274,306.84 | | | 46.40% | |
| **FY 1994** | **$1,139,969.08** | **$1,275,315.50** | **$135,346.42** | **46.40%** | **$62,800.74** |
| FY 1995 (prorated for five months) | $1,089,520.53 | $1,275,315.50 | $185,794.97 | 46.40% | $35,920.36 |
| FY 1995 (prorated for seven months) | $1,089,520.53 | $1,275,315.50 | $185,794.97 | 47.71% | $51,708.29 |
| **FY 1995** | | | | | **$87,628.65** |
| 1st, 2nd & 3rd Qtrs. 1996 | $799,800.00 | | | 47.71% | |
| 4th Qtr. 1996 | $256,466.63 | | | 47.71% | |
| **FY 1996** | **$1,071,613.76** | **$1,275,315.50** | **$203,701.74** | **47.71%** | **$97,186.10** |
| 1st, 2nd & 3rd Qtr. 1997 | $769,339.88 | | | 47.71% | |
| 4th Qtr. 1997 | $256,466.63 | | | 47.71% | |
| **FY 1997** | **$1,025,786.51** | **$1,275,315.50** | **$249,528.99** | **47.71%** | **$119,050.28** |
| 1st, 2nd & 3rd Qtrs. 1998 | $769,339.88 | | | 47.71% | |
| 4th Qtr. 1998 | $256,446.63 | | | 47.71% | |
| **FY 1998** | **$1,025,786.51** | **$1,275,315.50** | **$249,528.99** | **47.71%** | **$119,050.28** |
| | | | | | |
| **TOTAL CREDIT** | | | | | **$447,963.27** |

GSA calculated its share of the cost of the real estate tax appeals to be $70,268.06. GSA subtracted its total share of the cost of the real estate tax appeals from the total credit for the

reduction for real estate taxes, for a net credit of $377,695.21. GSA deducted this amount from the following rent check due to Saul II under Lease No. 20688. At no time prior to the Government's deduction of a credit allegedly due under the lease did the Contracting Officer issue a final decision in accordance with the Contract Disputes Act in order to exercise the Government's rights under the lease.

GSA further erred in SLA No. 12 by asserting a credit against the base year of the lease to which it was not entitled. After the real estate tax abatement, Saul II paid $1,275,315.50 in real estate taxes in 1993, rather than $1,411,066.50 as alleged by GSA in SLA No. 12. GSA erroneously asserted a credit of $62,988.46 for the base year of the lease.

On January 4, 2001, Saul II submitted a claim to the Contracting Officer to obtain a price adjustment under Lease No. 20688. Saul II argued that GSA's assertion of the credit under SLA No. 12 was inconsistent with the parties' intent in executing the lease and requested reformation of the lease. Saul II further argued that GSA's assertion of the credit was barred by the doctrine of accord and satisfaction based upon the SLAs entered into by the parties to adjust the rental amount annually. Saul II requested that GSA rescind SLA No. 12 and reimburse Saul II in the amount of $377,695.21 for credit claimed under the lease. Saul II further asserted that GSA inappropriately asserted a rental credit against the base year of the lease, and requested additional payment of $62,988.46 based upon such credit. On March 2, 2001, the Contracting Officer, Ms. Noreen Freeman, issued a written decision denying Saul II's claim.

Plaintiff expects that Defendant will rely upon facts that demonstrate that the parties did not mistakenly omit language modifying the "Tax Adjustment" clause in Lease No. 20688, specifically the language of the lease itself. In contrast, Plaintiff asserts that the parties' conduct in amending the two predecessor leases to modify the "Tax Adjustment" clause, their actions in

negotiating Lease No. 20688 and their actions during performance of Lease No. 20688 with respect to real estate taxes demonstrate their intent to modify the "Tax Adjustment" clause.

## II. ISSUES OF FACT AND LAW TO BE RESOLVED BY COURT

Plaintiff asserts that the Court should resolve the following issues of fact and law:

1. Whether the parties intended to modify the "Tax Adjustment" clause of Lease No. 20688 to prohibit the reduction of rent below the initial base rent based upon reductions in real estate taxes. During two predecessor leases for the same property, the parties modified the "Tax Adjustment" clause to include language preventing reductions in real estate taxes. Although the parties intended to include similar language modifying the "Tax Adjustment" clause in Lease No. 20688, they failed to do so during negotiations. During performance of Lease No. 20688, the parties acted consistent with their intent to include the modifying language, specifically the government did not assert a credit for rent reductions based upon successful tax appeals during the years in which Saul II successfully appealed the real estate tax.

2. Whether the SLAs functioned to establish a "new annual rent" that barred any reductions based upon reductions in real estate taxes. During the performance of Lease No. 20688, the government issued SLAs, which provided for annual adjustments to the initial lease's base rent for operating cost escalations. Each SLA contained the specific amount of the rental increase, the "new annual rent" and the effective date of the SLA. More importantly, the SLAs did not specifically preserve the right of the parties to seek or require any further rent adjustments for the specific year.

3. Whether the government improperly withheld rent owed to Saul II under SLA No. 12. The government issued SLA No. 12 in 1999 in which it asserted a credit against rent owed under the lease based upon reductions in real estate taxes for years 1992 through 1998 based

upon Saul II's successful tax appeals. In SLAs preceding SLA No. 12 issued during the years 1992 through 1998, the government failed to assert a credit based upon successful appeals of the real estate taxes for the property. The government also did not reserve its right to assert a credit in those SLAs.

4. Whether the government erroneously asserted a credit in SLA No. 12 against the base year of the lease to which it was not entitled. Lease No. 20688 provided that the government would be entitled to increases or decreases in rent based upon increases or decreases in real estate taxes from those taxes paid in the base year of the lease. Contrary to this provision, the government asserted a credit based upon a reduction in real estate taxes within the base year of the lease. As noted in SLA No. 12, the real estate taxes initially assessed for 601 Pennsylvania Avenue for 1992 totaled $1,411,066.50. However, following Saul II's appeal of the initial assessment, Saul II paid $1,275,315.50 in real estate taxes for the property. Accordingly, the base year real estate taxes for the property equaled Saul II's total liability for 1992, specifically $1,275,315.50. In SLA No. 12, however, the government asserted a credit based upon the successful appeal of real estate taxes in the base year of the lease (1992), subtracting the amount of the tax actually paid by Saul II ($1,275,315.50) from the amount of real estate taxes initially imposed ($1,411,066.50), for a credit totaling $62,988.46.

## III. APPLICABLE LEGAL PRINCIPLES

Plaintiff asserts that the following legal principles are applicable to this matter:

1. The government breached the lease by withholding lease payments. By withholding rent owed to Saul II in SLA No. 12, the Government has breached Lease No. 20688. Under the lease, the parties have entered into seven SLAs – SLA Nos. 2, 3, 6, 7, 9, 10 and 13 – to provide for annual rent adjustments for operating cost escalations. Each SLA, which specified

the amount of the rental increase, the total rental amount and the effective date of the SLA, constituted a new agreement between the parties. Under the SLAs, GSA and Saul II memorialized the "new annual rent" under Lease No. 20688 without reducing the rent for adjustments to the real estate tax, even though the government had actual knowledge of the change in tax treatment. In addition, GSA failed to reserve its right to take a credit against its rental payment for an adjustment to the real estate tax or to notify Saul II of its intention to take such action. Where the Government withholds monies owed to a contractor under a contract, it is in breach of the contract. *See Florida Engineered Constr. Prods. Corp. v. United States*, 41 Fed. Cl. 534, 539 (1998). GSA therefore has breached Lease No. 20688 by withholding lease payments due to Saul II.

2. The SLAs entered into by GSA and Saul II constitute an accord and satisfaction, precluding GSA from withholding payments due under Lease No. 20688. SLA Nos. 2, 3, 6, 7, 9, 10 and 13 established new annual rent for the applicable lease period, and formed substitute contracts by which GSA and Saul II established new lease agreements for that period. The SLAs lack any reservation of GSA's right to seek a reduction in the rent payments. Where the parties execute a bilateral modification to a contract that omits any reservation of a specific right, the parties subsequently may not seek to exercise such rights. *See C & H Commercial Contractors, Inc. v. United States*, 35 Fed. Cl. 246, 252 (1996) ("It is also well established that ordinarily an executed bilateral contract modification that contains no reservations constitutes an accord and satisfaction of a claim."). GSA therefore would be barred from withholding rent payments due under SLA No. 12.

3. The parties were mutually mistaken in entering Lease No. 20688. Because the parties were mutually mistaken in entering Lease No. 20688, the lease should be reformed to

reflect the parties' intention not to accept the tax adjustment provision that provided for a decrease in the rental amount of the lease. When the parties entered into Lease No. 20688, they neglected to amend Paragraph (D) of Section 3.4 of the lease despite their intention to do so and their past practice of making such amendments. As discussed previously, the parties amended Lease Nos. 60012 and 70162 to prohibit the decrease of the monthly rent below the initial base rent. In addition, GSA demonstrated its acceptance of this practice by failing to seek a reduction in the rental amount during the initial seven years of the lease and by executing supplemental lease amendments that provided for increased rent. Through this "course of dealing" and "course of trade" the parties' actions conformed to their understanding concerning each year's rental adjustment. Despite the intent of the parties to delete or amend Paragraph (D) of Section 3.4, GSA withheld rent payments due under the lease by unilaterally issuing SLA No. 15. Because the parties were mutually mistaken in their failure to delete or amend Paragraph (D) of the lease, Lease No. 20688 should be amended and GSA should make full payment of rent owed under the lease.

4. The government mistakenly calculated a credit for the base year of the lease. The tax adjustment provision of the lease designated real estate taxes paid in the base year as the benchmark against which changes in real estate taxes and corresponding changes in rent would be measured. The tax adjustment provision stated: "The government shall pay additional rent for its share of increases in real estate taxes over taxes paid for the calendar year in which the lease commences (base year)." Lease § 3.4(A). Although its inclusion in the lease is disputed by Saul II, the clause further provided: "In the event of any decreases in real estate taxes occurring during the term of occupancy under the lease, the rental amount will be reduced accordingly. The amount of such reduction will be determined in the same manner as increases in real estate

taxes." Lease § 3.4(D). Therefore, any increases or decreases in rent based upon changes in real estate taxes is measured by comparing the real estate tax paid for the base year with the real estate tax paid in a subsequent year. *See Greenwood Assocs., L.P. v. General Servs. Admin*., GSBCA No. 15994, 04-1 BCA ¶ 32479 (stating that "the base year of the lease is the year 2000, the taxes 'paid for' calendar year 2000, i.e., $223,153.77, are those by which the Government's obligation for increases and decreases in taxes are to be measured pursuant to the Tax Adjustment clause"). The District of Columbia initially imposed real estate taxes for 601 Pennsylvania Avenue for 1992 totaling $1,411,066.50; however, Saul II filed a successful challenge to those taxes and ultimately paid $1,275,315.50 for the base year of the lease. In SLA No. 12, the government asserted a credit of $62,988.46 for 1992 based upon the difference in the initial real estate assessment for the property and Saul II's total real estate tax liability for the year. By asserting this credit, the government improperly calculated a credit based on Saul II's successful appeal of real estate taxes within the base year of the lease.

Plaintiff anticipates that Defendant will articulate contrary positions to the legal issues set forth above. Set forth below are responses to Defendant's anticipated positions:

1. With respect to the breach of contract claim, the government likely will assert that the SLAs did not establish a "new annual rent" in years subsequent to the base year of the lease or bar the later assertion of claims not expressly reserved in the SLA. Plaintiff responds that the SLAs clearly established "new annual rent" for the year of their issuance and the government did not expressly reserve its right to assert a claim in the SLA. Moreover, Defendant had knowledge of the tax savings each year due to reports received from Saul II.

2. With respect to the accord and satisfaction claim, the government likely will assert that the proper subject matter is lacking because the SLAs omit any mention of the rent

reduction clause or a release of the government's rights, and that there was no "meeting of the minds" of the parties because there was no bona fide dispute at issue. As to proper subject matter, the subject matter of the SLAs and the government's claim of a credit in SLA No. 12 are identical, as both concern the amount of rent owed by the government on an annual basis. As to proper "meeting of the minds," each SLA indicated that Saul II would lease space to the government at 601 Pennsylvania Avenue in return for the new annual rent contained in each SLA and without the reservation of any rights to seek a rent reduction.

3. With respect to the mutual mistake claim, the government likely will argue that the parties were not mistaken in their belief that the reduction in tax liability could operate to reduce the taxes to an amount less than the base rent. Plaintiff responds that during the two predecessor leases for the same property, the parties modified the "Tax Adjustment" clause to include such language preventing reductions in real estate taxes. Although the parties intended to include similar language modifying the "Tax Adjustment" clause in Lease No. 20688, they failed to do so during negotiations. Plaintiff also noted that during performance of Lease No. 20688, the parties acted consistent with their intent to include the modifying language, specifically the government did not assert a credit for rent reductions based upon successful tax appeals during the years in which Saul II successfully appealed the real estate tax. Finally, the parties' contemporaneous actions demonstrated that the parties believed the rent could not be reduced as a result of tax adjustments.

Respectfully submitted,

/s/ Thomas O. Mason

Thomas O. Mason, Esq.
Francis E. Purcell, Jr., Esq.
WILLIAMS MULLEN
8270 Greensboro Drive, Suite 700
McLean, Virginia 22102
(703) 760-5200
(703) 748-0244 (fax)

Attorneys for Plaintiff

April 13, 2005

1141956v1